# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA, *ex rel.* DEBORAH SHELDON, *et al.*,
*Plaintiff-Appellant*,

v.

ALLERGAN SALES, LLC et al., *Defendants-Appellees*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Case No. 1:14-cv-02535-ELH
The Honorable Ellen L. Hollander, U.S. District Judge

## BRIEF OF *AMICUS CURIAE* THE ANTI-FRAUD COALITION IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL

Jacklyn DeMar
THE ANTI-FRAUD COALITION
1220 19th Street N.W. – Suite 501
Washington, DC 20036
Tel: (202) 296-4826
Fax: (202) 296-4838
Email: jdemar@taf.org

Samuel J. Buffone, Jr.
Michael DeJesus
BUFFONE LAW GROUP PLLC
4301 Connecticut Ave NW, Ste 310
Washington, DC 20008
Phone: (202) 670-0403
Email: sam@buffonelawgroup.com

Attorneys for Amicus Curiae

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>24-1793</u>

Short Caption: <u>United States ex rel. Sheldon v. Allergan Sales, LLC</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> [ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>The Anti-Fraud Coalition - Amicus Curiae</u>

_____

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Buffone Law Group</u>

_____

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    <u>N/A</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>N/A</u>

Attorney's Signature: <u>/s/ Sam Buffone</u>     Date: <u>12/10/2024</u>

Attorney's Printed Name: <u>Sam Buffone</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** [✓]  **No** [ ]

Address: <u>4301 Connecticut Ave. NW, Suite 310</u>

<u>Washington, DC 20008</u>

Phone Number: <u>(202) 997-8562</u>     Fax Number: _____

E-Mail Address: <u>sam@buffonelawgroup.com</u>

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 24-1793

Short Caption: United States ex rel. Sheldon v. Allergan Sales, LLC et al

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

The Anti-Fraud Coalition - Amicus Curiae

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Buffone Law Group

(Note: Jacklyn DeMar, the undersigned, is directly employed by the Anti-Fraud Coalition)

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Jacklyn DeMar    Date: 12/10/2024

Attorney's Printed Name: Jacklyn DeMar

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☐  No ☑

Address: 1220 19th Street, N.W., Suite 501

Washington, DC 20036

Phone Number: (202) 296-4826    Fax Number: (202) 296-4838

E-Mail Address: jdemar@taf.org

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 24-1793

Short Caption: United States ex rel. Sheldon v. Allergan Sales, LLC

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

The Anti-Fraud Coalition - Amicus Curiae

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Buffone Law Group

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

N/A

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Michael DeJesus      Date: 12/10/2024

Attorney's Printed Name: Michael DeJesus

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).      Yes ☐    No ☑

Address: 4301 Connecticut Ave. NW, Suite 310

Washington, DC 20008

Phone Number: (908) 655-7789      Fax Number:

E-Mail Address: michael@buffonelawgroup.com

rev. 12/19 AK

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(A), The Anti-Fraud Coalition ("TAF Coalition") states that it is a corporation organized under Section 501(c)(3) of the Internal Revenue Code. It has no parent corporation and no stock owned by a publicly owned company. TAF Coalition represents no parties in this matter and has no pecuniary interest in its outcome. However, TAF Coalition has an institutional interest in the effectiveness and correct interpretation of the False Claims Act.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS.................................................................................... ii

TABLE OF AUTHORITIES .............................................................................. iii

STATEMENT OF INTEREST OF *AMICUS CURIAE*............................................1

SUMMARY OF ARGUMENT ..............................................................................2

ARGUMENT .......................................................................................................4

    I.      AMBIGUITY IN A REGULATORY SCHEME DOES NOT
           PRECLUDE FCA LIABILITY............................................................4

          A.      Relators can successfully allege scienter even when a
                  regulatory requirement is ambiguous. .......................................4

          B.      Falsity can be found even when a regulatory regime is
                  complicated. ...............................................................................9

    II.     FALSITY SHOULD BE ANALYZED BEFORE SCIENTER,
           USING AGENCY GUIDANCE. ......................................................16

          A.      Falsity should be evaluated before scienter. ............................17

          B.      *Loper Bright* does not preclude Courts from considering
                  agency guidance in determining the meaning of a statute
                  or regulation. ............................................................................19

CONCLUSION....................................................................................................22

CERTIFICATE OF COMPLIANCE.......................................................................23

CERTIFICATE OF SERVICE ..............................................................................24

# TABLE OF AUTHORITIES

**Cases**

*Godecke ex rel. U.S. v. Kinetic Concepts*, 937 F.3d 1201 (9th Cir. 2019) ...............7

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776 (4th Cir. 2024) 16, 17

*Kisor v. Wilke*, 588 U.S. 558 (2019) .......................................................................15

*Loper Bright v. Raimondo*, 144 S. Ct. 2244 (2024).............................. 16, 19, 20, 22

*Mayfield v. U.S. Dep't of Labor*, 117 F.4th 611 (5th Cir. 2024) ............................20

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) .......................................................20

*U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364 (4th Cir. 2015) ...........................10

*U.S. ex rel. Druding v. Druding*, 952 F.3d 89 (3rd Cir. 2020) ...............................17

*U.S. ex rel. Hunt v. Merck-Medco Managed Care, LLC*, 336 F. Supp. 2d. 430 (E.D. Pa. 2004) ...............................................................................................................15

*U.S. ex rel. Jefferson v. Roche Holding AG*, 489 F. Supp. 3d 418 (D. Md. 2020) ..18

*U.S. ex rel. Lynch v. Univ. of Cincinnati Med. Ctr., LLC*, Case No. 1:18-cv-587, 2020 U.S. Dist. LEXIS 48214 (S.D. Oh. Mar. 20, 2020) ...................................21

*U.S. ex rel. Oliver v. Parsons Co.*, 195 F.3d 457 (9th Cir. 1999) ...........................10

*U.S. ex rel. Phalp v. Lincare Holdings*, 857 F.3d 1148 (11th Cir. 2017).................5

*U.S. ex rel. Schutte v. SuperValu*, 598 U.S. 739 (2023) ................................. passim

*U.S. ex rel. Souza v. Embrace Home Loans*, Case No. 1:22-cv-00453-JJM-PAS, 2023 U.S. Dist. LEXIS 113544 (D.R.I. Jun. 28, 2023)..........................................8

*U.S. ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746 (3d Cir. 2017) .................8

*U.S. ex rel. USN4U, LLC v. Wolf Creek Fed. Servs.*, 34 F.4th 507 (6th Cir. 2022)..7

*United States v. Bollinger Shipyards, Inc.*, 775 F.3d 255 (5th Cir. 2014).............6, 8

*United States v. Chen*, 402 Fed. Appx. 185 (9th Cir. 2010).....................................9

*United States v. Neifert-White Co.*, 390 U.S. 228 (1968).......................................16

*United States v. Univ. of Phoenix,* 461 F.3d 1166 (9th Cir. 2006).........................18

*Univ. Health Servs. v. U.S. ex rel. Escobar*, 579 U.S. 186 (2016) .........................19

**Statutes**

31 U.S.C. §§ 3729-3733 ........................................................................................1, 2

42 U.S.C. § 1396r-8(c)(1)(C)...............................................................................4

**Other Authorities**

Brendan Pierson, "Humana to pay $90 mln to settle claim that it overcharged Medicare for drugs," Reuters (Aug. 16, 2024), https://www.reuters.com/legal/government/humana-pay-90-mln-settle-claim-that-it-overcharged-medicare-drugs-2024-08-16/ ...............................................13

Medicare and Medicaid: Additional Actions Needed to Enhance Program Integrity and Save Billions, Gov't Accountability Office, https://www.gao.gov/products/gao-24-107487 ....................................................22

Newsroom, "Medicare Part D – Direct and Indirect Remuneration (DIR)," Ctrs. For Medicare & Medicaid Servs. (Jan. 19, 2017), https://www.cms.gov/newsroom/fact-sheets/medicare-part-d-direct-and-indirect-remuneration-dir .................................................................................................13

Press Release, "Actavis Completes Forest Laboratories Acquisition" (Jul. 1, 2024), https://www.prnewswire.com/news-releases/actavis-completes-forest-laboratories-acquisition-265360391.html.............................................................10

Press Release, Dep't of Justice, "U.S. Attorney Announces $25.5 Million Settlement With Durable Medical Equipment Supplier Lincare Inc. For Fraudulent Billing Practices" (Feb. 15, 2024), https://www.justice.gov/usao-sdny/pr/us-attorney-announces-255-million-settlement-durable-medical-equipment-supplier ...........14

Press Release, U.S. Dep't of Jistice, Booz Allen Agrees to Pay $377.45 Million to Settle False Claims Act Allegations (Jul. 23, 2023), https://www.justice.gov/opa/pr/booz-allen-agrees-pay-37745-million-settle-false-claims-act-allegations ................................................................................12

Press Release, U.S. Dep't of Justice, "Allergan Agrees to Plead Guilty and Pay $600 Million to Resolve Allegations of Off-Label Promotion of Botox" (Sept. 1, 2010), https://www.justice.gov/opa/pr/allergan-agrees-plead-guilty-and-pay-600-million-resolve-allegations-label-promotion-botox .............................................11

Press Release, U.S. Dep't of Justice, "Lincare Holdings Agrees to Pay $29 Million to Resolve Claims of Overbilling Medicare for Oxygen Equipment in Largest-Ever Health Care Fraud Settlement in Eastern Washington" (Aug. 28, 2023),

https://www.justice.gov/usao-edwa/pr/lincare-holdings-agrees-pay-29-million-resolve-claims-overbilling-medicare-oxygen ...................................................... 14

Press Release, U.S. Dep't of Justice, Consulting Companies to Pay $11.3M for Failing to Comply with Cybersecurity Requirements in Federally Funded Contract" (Jun. 17, 2024), https://www.justice.gov/opa/pr/consulting-companies-pay-113m-failing-comply-cybersecurity-requirements-federally-funded .......... 12

Press Release, U.S. Dep't of Justice, Deputy Attorney General Lisa O. Monaco Announces New Civil Cyber-Fraud Initiative (Oct. 6, 2021), https://www.justice.gov/opa/pr/deputy-attorney-general-lisa-o-monaco-announces-new-civil-cyber-fraud-initiative .......................................................... 7

Press Release, U.S. Dep't of Justice, False Claims Act Settlements and Judgments Exceed $2.68 Billion in Fiscal Year 2023 (Feb. 22, 2024), https://www.justice.gov/opa/pr/false-claims-act-settlements-and-judgments-exceed-268-billion-fiscal-year-2023 ...................................................... 6

Press Release, U.S. Dep't of Justice, Justice Department Takes Action Against COVID-19 Fraud (Mar. 26, 2021), https://www.justice.gov/opa/pr/justice-department-takes-action-against-covid-19-fraud .................................................. 13

Press Release, U.S. Department of Justice, "False Claims Act Settlements and Judgments Exceed $2.68 Billion in Fiscal Year 2023" (Feb. 22, 2023), https://www.justice.gov/opa/pr/false-claims-act-settlements-and-judgments-exceed-268-billion-fiscal-year-2023 ...................................................... 2

Report, Gov't Accountability Office, "Fraud Risk Management: 2018-2022 Data Show Federal Government Loses an Estimated $233 Billion to $521 Billion Annually to Fraud, Based on Various Risk Environments," https://www.gao.gov/products/gao-24-105833 .................................................. 21

S. Rep. 99-345 .............................................................................................. 2, 9, 16

Scott Zamost and Contessa Brewer, "Inside the mind of criminals: How to brazenly steal $100 billion from Medicare and Medicaid," CNBC (Mar. 9, 2023), https://www.cnbc.com/2023/03/09/how-medicare-and-medicaid-fraud-became-a-100b-problem-for-the-us.html .............................................................. 21

**Rules**

Federal Rule of Appellate Procedure 29 .................................................... 1

Federal Rule of Appellate Procedure 29(a)(2) ........................................ 1

Federal Rule of Civil Procedure 9(b) ........................................................ 7

# STATEMENT OF INTEREST OF *AMICUS CURIAE*

Pursuant to Federal Rule of Appellate Procedure 29, TAF Coalition submits this brief in support of plaintiff-appellant Deborah Sheldon ("Relator Sheldon") and for reversal of the trial court's Order dismissing her Amended Complaint.[1]

TAF Coalition is a non-profit public interest organization dedicated to combatting fraud against the Government and protecting public resources through public-private partnerships. TAF Coalition is committed to preserving effective anti-fraud legislation at the federal and state levels. The organization has worked to educate the public and the legal community about the *qui tam* provisions of the False Claims Act (FCA), 31 U.S.C. §§ 3729-3733, and has provided testimony to Congress about ways to improve the FCA.

TAF Coalition regularly participates in litigation as *amicus curiae*. TAF Coalition is supported by *qui tam* relators and their counsel, by membership dues and fees, and by private donations. TAF Coalition is the 501(c)(3) arm of Taxpayers Against Fraud, which was founded in 1986.

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), TAF Coalition states that all parties consent to the filing of this brief.

---

[1] No party's counsel authored this brief in whole or in part. No person other than *amicus* and its counsel contributed any money intended to fund the preparation or submission of this brief.

## SUMMARY OF ARGUMENT

The False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, is the United States' primary litigation tool for fighting fraud, dating back to the Civil War. *See* S. Rep. 99-345 at 8. The law has been used to recover funds lost to fraud and to deter future fraud in federal government programs. The law has been extremely effective in recovering funds lost to fraud, with recoveries totaling $2.68 billion for the 2023 fiscal year alone.[2] Over half of that amount, more than $1.8 billion, was money recouped from fraud on federal healthcare programs.[3] In all, the United States has recovered over *$75 billion* from October 1, 1986 through September 30, 2023 from FCA cases.[4]

Here, Relator Sheldon brought suit against Forest Labs[5] for violating the FCA by allegedly submitting false claims to the United States' Medicaid program. Relator alleges the Forest Labs did not include all discounts provided to other customers in

---

[2] Press Release, U.S. Department of Justice, "False Claims Act Settlements and Judgments Exceed $2.68 Billion in Fiscal Year 2023" (Feb. 22, 2023), https://www.justice.gov/opa/pr/false-claims-act-settlements-and-judgments-exceed-268-billion-fiscal-year-2023

[3] *Id.* (stating "over $1.8 billion related to matters that involved the health care industry" was recovered, not including "additional amounts for state Medicaid programs").

[4] *Id.* at 3.

[5] Forest Labs was acquired by Allergan in 2014.

its calculation of "Best Price" in violation of the Medicaid Drug Rebate Statute ("the Rebate Statute") and associated regulations, resulting in Medicaid purchasing drugs at a price higher than Forest Labs' realized lowest price per unit. This scheme potentially defrauded the United States out of millions of dollars.

This brief addresses two legal errors in the district court's analysis of the "two essential elements of an FCA violation … (1) the falsity of the claim and (2) the defendant's knowledge of the claim's falsity." *See U.S. ex rel. Schutte v. SuperValu*, 598 U.S. 739, 747 (2023). First, the district court ignored the central holding of the Supreme Court's recent decision in *Schutte* by concluding that the existence of an ambiguous regulatory requirement precluded scienter and falsity.[6] Second, the district court incorrectly conflated the analysis of scienter and falsity, evaluated scienter before falsity, and failed to provide sufficient weight to agency guidance on what constitutes a false claim. The district court's approach, if adopted more generally, could insulate fraud in a wide range of government programs necessarily involving complex regulatory schemes. However, sophisticated entities voluntarily participate in these schemes and are fully capable of understanding complex rules.

---

[6] This brief does not opine on the interpretation of the regulatory scheme, specifically whether any requirement is in fact ambiguous, but rather only the district court's analysis of falsity and scienter under the FCA.

# **ARGUMENT**

## I. AMBIGUITY IN A REGULATORY SCHEME DOES NOT PRECLUDE FCA LIABILITY.

Ambiguity in a statute or regulation is not grounds to preclude a claim under the FCA. In *Schutte*, the Supreme Court recently held that "facial ambiguity alone" in a statute, regulation, or material condition of payment "is not sufficient to preclude a finding that respondents knew their claims were false." *Schutte*, 598 U.S. at 749. By contrast, in this action, the district court evaluated scienter by considering whether the text of the Rebate Statute, 42 U.S.C. § 1396r-8(c)(1)(C), and associated regulations were ambiguous, instead of focusing on the Defendants' alleged actions and state of mind. This approach runs directly counter to the Supreme Court's decision in *Schutte.* While ambiguity may be relevant to falsity, it does not preclude a finding of scienter, which hinges on the Defendant's state of mind when the claim was submitted. Ambiguity in a regulatory scheme also does not mean a claim is incapable of being false.

### A. Relators can successfully allege scienter even when a regulatory requirement is ambiguous.

The Supreme Court in *Schutte* expressly rejected the Defendants' argument that "an objectively reasonable interpretation" of a phrase could foreclose a finding of scienter, explaining that the "facial ambiguity of [a] phrase[…] does not by itself preclude a finding of scienter under the FCA." *Schutte*, 598 U.S. at 740. Even prior

to *Schutte*, courts of appeals rejected the notion that such post-hoc arguments about ambiguity in a statutory scheme cloud preclude scienter. "Although ambiguity may be relevant to the scienter analysis, it does not foreclose a finding of scienter" where the defendant "actually knew or should have known that its conduct violated a regulation in light of any ambiguity at the time of the alleged violation." *U.S. ex rel. Phalp v. Lincare Holdings*, 857 F.3d 1148, 1155 (11th Cir. 2017).

The district court's observation that an objective approach is necessary as "direct proof of scienter is often unavailable, because… there is no way of directly scrutinizing the workings of the human or corporate mind," misunderstands the scienter inquiry. *U.S. ex rel. Sheldon v. Forest Labs*, Case No. ELH-14-2535, 2024 U.S. Dist. LEXIS 129331, at \*57 (D. Md. Jul. 23, 2024) (engaging in an objective analysis of the statute when considering scienter). As the Supreme Court held in *Schutte*, and other courts have recognized, the scienter inquiry looks to specific facts alleged about the *Defendant's* actions. *See, e.g, U.S. ex rel. Campie v. Gilead Scis.*, 862 F.3d 890, 904 (9th Cir. 2017) (finding scienter to be "adequately pled" where Relator alleged Defendant "took internal actions perpetuating its fraud" and "established practices to deceive the government"). Relators are not obligated to show Defendants knew the correct course of action, only that they acted with at least reckless disregard, evinced by "circumstantial evidence and general allegations of [Defendant's] knowledge and intent." *See, e.g., United States v. Bollinger Shipyards,*

*Inc.*, 775 F.3d 255, 261 (5th Cir. 2014) (holding that "[t]he FCA does not require the [Plaintiff] to show that [Defendant] knew the correct figure" when inputting false data into a calculator used for modifying Coast Guard ships). The district court's "objective" approach reinstates the very analysis that the Supreme Court rejected in *Schutte* and makes the Defendants' alleged actions and actual state of mind irrelevant, in direct conflict with the text and intent of the FCA.

The district court's standard, if adopted more broadly, would weaken the FCA with respect to combatting novel theories of fraud, or fraud on new federal programs where the government has not anticipated every way the program could be cheated. For example, the Paycheck Protection Program only dates back to 2020, yet has been the subject of extensive fraud, with the United States recovering $48.3 million in pandemic-related fraud in FY 2023 alone across over 200 FCA actions.[7] Additionally, the Department of Justice's Civil Cyberfraud Initiative, announced in 2021, kicked off a spate of FCA actions in the cybersecurity space with little precedent in prior FCA enforcement or longstanding federal regulation.[8]

---

[7] Press Release, U.S. Dep't of Justice, False Claims Act Settlements and Judgments Exceed $2.68 Billion in Fiscal Year 2023 (Feb. 22, 2024), https://www.justice.gov/opa/pr/false-claims-act-settlements-and-judgments-exceed-268-billion-fiscal-year-2023

[8] Press Release, U.S. Dep't of Justice, Deputy Attorney General Lisa O. Monaco Announces New Civil Cyber-Fraud Initiative (Oct. 6, 2021),

Cybersecurity regulations are necessarily complex and evolving with the advance of technology.[9] Allowing fraudsters to hide behind post-hoc arguments about statutory or regulatory ambiguity would mean losses of millions in fraud on these and other federal programs.

The district court's reasoning would also effectively create a presumption in Defendant's favor in the analysis of scienter, contrary to pleading standards, which only require that scienter be pled "generally." *See* FRCP 9(b); *see also, e.g., U.S. ex rel. USN4U, LLC v. Wolf Creek Fed. Servs.*, 34 F.4th 507, 515-16 (6th Cir. 2022) (stating "at the motion-to-dismiss stage, a plaintiff need only allege the scienter element generally" and finding Relator successfully alleged scienter); *Godecke ex rel. U.S. v. Kinetic Concepts*, 937 F.3d 1201, 1211-12 (9th Cir. 2019) (holding Relator sufficiently pled scienter by alleging Defendant took, like "submit[ing] claims without the requisite […] modifier" and alleging executives knew claims were submitted without proper documentation). It also creates an unduly high

_____

https://www.justice.gov/opa/pr/deputy-attorney-general-lisa-o-monaco-announces-new-civil-cyber-fraud-initiative

[9] Requests for Proposal on cybersecurity projects are a case in point. Governments often make requests that incorporate current best practices, such as that "[c]ontractor[s]… shall utilize industry best prices and technology… to protect safeguard, and secure their cloud services[.]" State of New York, Emergency Request for Proposal at § 17, Hosted Services ("Cloud") Requirements and Security at C, https://hcr.ny.gov/system/files/documents/2021/01/210113_federal-rental-assistance-rfp_final_1.pdf.

standard by both requiring the complaint plead evidence of actual knowledge, while also precluding a finding of scienter when a statute or regulation is allegedly ambiguous. This tactic has been rejected by other courts. *See U.S. ex rel. Souza v. Embrace Home Loans*, Case No. 1:22-cv-00453-JJM-PAS, 2023 U.S. Dist. LEXIS 113544, at *9-11 (D.R.I. Jun. 28, 2023) (finding that specific conduct by executives including "meet[ing] with HUD" while "allegedly fail[ing] to report the ongoing fraud" constituted an allegation of scienter even though Defendants claimed to not know of fraud while implementing alleged fraudulent practices).

Finally, looking at the Defendant's actions does not create unnecessary risks to Defendants who ask regulators questions, unlike the district court asserted. *See Sheldon*, 2024 U.S. Dist. LEXIS 129331, at *75 (rejecting Relator's argument that Forest's "hiring an attorney to ask CMS to change its regulations" evinced scienter because "request for clarification is precisely the kind of simple inquiry that Congress intended to encourage"). If companies make reasonable inquiries and the United States approves the conduct, the recognized defense of government knowledge would defeat any finding of scienter. *See, e.g., U.S. ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 756 (3d Cir. 2017) (finding scienter not established where "the government knows and approves of the facts underlying an allegedly false claim prior to presentment"); *Bollinger,* 775 F.3d at 263 (holding "the government's knowledge of the falsity of the statement or claim can defeat FCA

liability" where "the claimant knew that the government knew of the falsity of the claim and was willing to pay anyway"); *United States v. Chen*, 402 Fed. Appx. 185, 188 (9th Cir. 2010) (stating "[e]vidence that a [D]efendant relied on the government's advice in submitting his claim[…] may show that the [D]efendant lacked sufficient knowledge for liability under the FCA" but that this was "highly fact dependent").

In contrast, the district court's reliance on objective statutory analysis when evaluating scienter encourages the very "ostrich-like conduct" which Congress intended to prohibit under the FCA. *See* S. Rep. 99-345, at 7 (stating "'ostrich-like' conduct which can occur in large corporations poses insurmountable difficulties for civil false claims recoveries"). Under the district court's ruling Defendants who ask less than fulsome questions about potentially ambiguous statutory or regulatory requirements and fail to follow up can maintain a defense that they did not act knowingly based on an alleged ambiguity the Defendant ignored.

**B.      Falsity can be found even when a regulatory regime is complicated.**

The district court also adopted a narrow view of falsity where the underlying regulatory regime is complex or arguably ambiguous. *Forest Labs,* 2024 U.S. Dist. LEXIS 129331, at *84-85 (holding that the Relator failed to establish falsity because "the Rebate Statute, Rebate Agreement, and related regulations neither clearly require aggregation nor clearly disclaim the need for aggregation"). As other circuits

found, just because regulations are "technical and complex" does not excuse noncompliance: "[t]heir meaning is ultimately the subject of judicial interpretation, and it is [Defendant's] compliance with these regulations, as interpreted by this court, that determines" falsity. *U.S. ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 463 (9th Cir. 1999). A Defendant's failure to comply with regulations that may require a degree of "interpretation of disputed legal questions" can still give rise to FCA liability where there is an "objective" falsehood requiring an "objective inquiry." *U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 383-83 (4th Cir. 2015) (affirming jury verdict for Relator and rejecting Defendant's argument that jury ought to have been instructed that claims based on differing legal interpretations cannot be false). In short, either a Defendant "complied with the" applicable statute "or it didn't." *Id.*

Federal programs like Medicaid are necessarily complex and may have some degree of underlying ambiguity but this does not mean an entity's submissions are incapable of being false, particularly when that entity has prior experience interpreting federal healthcare requirements. The Defendant in this suit, Forest Labs, was valued at roughly $28 billion when it was ultimately acquired by Allergan.[10]

---

[10] Press Release, "Actavis Completes Forest Laboratories Acquisition" (Jul. 1, 2024), https://www.prnewswire.com/news-releases/actavis-completes-forest-laboratories-acquisition-265360391.html (recounting acquisition by Actavis, which would eventually become Allergan).

Allergan, as part of a prior FCA settlement with the United States, executed a Corporate Integrity Agreement requiring it to "annually review the company's compliance program and[…] annually certify that [its] departments or functional areas are compliant with federal health care program requirements[.]"[11] Allergan promised the United States, as part of its prior settlement of FCA liability, that it would comply with all federal healthcare program requirements, and should be not be able to avoid that obligation with post-hoc complaints of ambiguity.

Sophisticated entities that participate in lucrative federal programs should not be able to avoid their obligation to turn square corners in their dealings with the government by arguing that the regulatory regime is complex. Federal contractors have settled with the United States to the tune of hundreds of millions of dollars to resolve violations of various complex regulatory schemes. For example, cost accounting standards (CAS) are a specific accounting scheme unique only to financial reporting under the Federal Acquisition Regulations. Like the Rebate Statute, CAS is a sector-specific complex regulatory scheme that participating contractors are expected to know and follow. Notwithstanding that complexity, Booz

---

[11] Press Release, U.S. Dep't of Justice, "Allergan Agrees to Plead Guilty and Pay $600 Million to Resolve Allegations of Off-Label Promotion of Botox®" (Sept. 1, 2010), https://www.justice.gov/opa/pr/allergan-agrees-plead-guilty-and-pay-600-million-resolve-allegations-label-promotion-botox

Allen Hamilton agreed to pay the United States $377.45 million to settle FCA liability for alleged violation of cost accounting standards.[12] Likewise, federal cybersecurity regulations and contractual requirements are a new and evolving area, and federal contractors willingly agree to abide by cybersecurity requirements when they agree to contracts to provide online services for the federal government. Despite this, two large consulting firms, Guidehouse and Nan McKay, agreed to collectively pay the United States $11 million for failing to complete contractually required cybersecurity obligations for administering a program under the COVID emergency rental assistance program.[13] Additionally, after the CARES Act was passed by Congress to help manage the fall out from the COVID-19 pandemic, over $2.2 trillion was disbursed through various federal agencies which had not yet issued authoritative guidance on how eligible companies should seek funds through federal programs. The federal government successfully used the FCA to recover from

---

[12] Press Release, U.S. Dep't of Justice, Booz Allen Agrees to Pay $377.45 Million to Settle False Claims Act Allegations (Jul. 23, 2023), https://www.justice.gov/opa/pr/booz-allen-agrees-pay-37745-million-settle-false-claims-act-allegations

[13] Press Release, U.S. Dep't of Justice, Consulting Companies to Pay $11.3M for Failing to Comply with Cybersecurity Requirements in Federally Funded Contract" (Jun. 17, 2024), https://www.justice.gov/opa/pr/consulting-companies-pay-113m-failing-comply-cybersecurity-requirements-federally-funded

entities that obtained funds to which they were not entitled based on the common understanding of the eligibility requirements.[14]

Participants in federal healthcare programs are also expected to comply with the complex federal programs that earn them large financial profits. For example, Medicare Part D, which covers prescription drugs, is particularly complicated, with the United States paying partially capitated payments to private insurers based on transaction data reported by those same insurers that the United States trusts to be accurate.[15] Humana, one of the largest healthcare companies in the United States and a Medicare Part D contractor, recently agreed to pay $90 million to the federal government in connection with allegations that it overstated the benefits it provided in order to make inflated claims for payment.[16] Many healthcare companies are repeat offenders: Lincare, a large durable medical equipment supplier, paid $29

---

[14] Press Release, U.S. Dep't of Justice, Justice Department Takes Action Against COVID-19 Fraud (Mar. 26, 2021), https://www.justice.gov/opa/pr/justice-department-takes-action-against-covid-19-fraud

[15] Newsroom, "Medicare Part D – Direct and Indirect Remuneration (DIR)," Ctrs. For Medicare & Medicaid Servs. (Jan. 19, 2017), https://www.cms.gov/newsroom/fact-sheets/medicare-part-d-direct-and-indirect-remuneration-dir

[16] Brendan Pierson, "Humana to pay $90 mln to settle claim that it overcharged Medicare for drugs," Reuters (Aug. 16, 2024), https://www.reuters.com/legal/government/humana-pay-90-mln-settle-claim-that-it-overcharged-medicare-drugs-2024-08-16/

million and $25.5 million to the United States in 2023 and 2024, respectively, and made factual admissions concerning its improper conduct in connection with overbilling Medicare Parts B and C.[17] In both instances, Lincare violated the FCA with respect to the rental of medical devices, and Lincare went on to violate the FCA the second time after it had entered a Corporate Integrity Agreement with the federal government in connection with the first settlement.[18]

The United States cannot be hamstrung in transacting with sophisticated companies engaging in *billions* of dollars of transactions with the United States, because a federal regulatory regime is complicated. Unlike the hypothetical driver the Supreme Court referenced in *Schutte* who "might have no way of knowing what speeds are reasonable and what speeds are too fast," healthcare providers like Allergan have a wealth of prior agency guidance and FCA enforcement actions to draw on to "[receive] notice" that the United States expects participants in federal

---

[17] Press Release, U.S. Dep't of Justice, "Lincare Holdings Agrees to Pay $29 Million to Resolve Claims of Overbilling Medicare for Oxygen Equipment in Largest-Ever Health Care Fraud Settlement in Eastern Washington" (Aug. 28, 2023), https://www.justice.gov/usao-edwa/pr/lincare-holdings-agrees-pay-29-million-resolve-claims-overbilling-medicare-oxygen; *see also* Press Release, Dep't of Justice, "U.S. Attorney Announces $25.5 Million Settlement With Durable Medical Equipment Supplier Lincare Inc. For Fraudulent Billing Practices" (Feb. 15, 2024), https://www.justice.gov/usao-sdny/pr/us-attorney-announces-255-million-settlement-durable-medical-equipment-supplier

[18] *Id.*

healthcare programs to act honestly. *See Forest Labs*, 2024 U.S. Dist. LEXIS 129331, at *54 (quoting *Schutte*, 598 U.S. at 754). Participants in federal programs and vendors to the United States are obligated to maintain compliance programs to help them parse prior guidance and enforcement actions, and through these programs are required to both understand and comply with complex regulatory regimes. *Cf. U.S. ex rel. Hunt v. Merck-Medco Managed Care, LLC*, 336 F. Supp. 2d. 430, 441 (E.D. Pa. 2004) (allegations that compliance program was "non-existent or insufficient" helped establish knowing submission of false claims).

The existence of a disputed legal question in the regulatory regime does not shield entities from FCA liability. The Supreme Court has recognized that most complex regulations can still be interpreted. *See Kisor v. Wilke*, 588 U.S. 558, 575 (2019) (stating that "[a]gency regulations can sometimes make the eyes glaze over. But hard interpretive conundrums, even relating to complex rules, can often be solved"). If companies could ignore the interpretation and guidance from United States agencies running the program at issue, the United States would be unable to effectively ensure entities are complying with federal programs. As discussed below in § II(B) *infra*, completely ignoring agency guidance would undercut the purpose of the FCA as an enforcement tool "reach[ing] all fraudulent attempts to cause the Government to pay ou[t] sums of money… in violation of contract terms,

specifications, statute, or regulation," whether ambiguous or not. S. Rep. 99-345 at 9.

## II. FALSITY SHOULD BE ANALYZED BEFORE SCIENTER, USING AGENCY GUIDANCE.

The district court also read falsity narrowly and circumscribed the falsity inquiry in two ways: by deciding scienter before analyzing falsity and by misapplying the Supreme Court's decision in *Loper Bright v. Raimondo*, 144 S. Ct. 2244 (2024). These errors compounded each other and resulted in an improperly truncated view of falsity.

Though originally passed during the Lincoln Administration to combat war-profiteering during the Civil War, the FCA is "intended to reach all types of fraud, without qualification, that might result in financial loss" to the United States. *See United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968). In line with the FCA's broadly remedial purpose, the Supreme Court has "consistently refused to accept a rigid, restrictive reading" of the FCA that would limit the United States' ability to protect the public fisc. *Neifert-White Co.*, 390 U.S. at 232. Similarly, courts of appeals, including this Circuit, have interpreted the FCA's falsity element broadly. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 786 (4th Cir. 1998) (rejecting a "narrow interpretation" of falsity by the district court, and holding "the district court's approach is in contradiction to the legislative history of the statute and to many courts, including the Supreme Court[…]" that "the False Claims

Act should be broadly construed"). An improperly narrow reading of falsity threatens the effectiveness of this valuable tool and would raise unnecessary hurdles for enforcement actions brought by both the United States and Relators. *See, e.g., id.*

## A. Falsity should be evaluated before scienter.

The decision below first evaluated scienter through an analysis of the text of the Best Price statute. *Forest Labs*, 2024 U.S. LEXIS 129331, at *58 (stating "to evaluate the sufficiency of Sheldon's allegation that Forest acted with culpable 'subjective beliefs,' I must conduct an unmistakably objective inquiry into the meaning of the Rebate Statute, Rebate Agreement, and related regulations"). The district court's decision to begin with scienter incorrectly comingled falsity and scienter for two reasons: (1) falsity and scienter are independent elements; and (2) scienter does not exist without falsity.

Courts of appeals, including this one, have recognized that falsity and scienter are distinct elements. *See Harrison*, 176 F.3d at 788 (outlining four-prong test for FCA liability as "(1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due"); *See, e.g., U.S. ex rel. Druding v. Druding*, 952 F.3d 89, 96 (3rd Cir. 2020) (stating "the plain language of the FCA denotes scienter as an element independent of falsity"). Other decisions in this circuit have likewise recounted the falsity and

scienter prongs of the FCA as separate and distinct. *See U.S. ex rel. Jefferson v. Roche Holding AG*, 489 F. Supp. 3d 418, 428 (D. Md. 2020) (stating "the relator must plausibly allege four distinct elements[,]" two of which are "a false statement or fraudulent course of conduct" and "made or carried out with the requisite scienter").

Second, the falsity inquiry necessarily precedes evaluation of scienter because "the scienter requirement of the FCA is plainly directed to the falsity of the claims submitted." *See Schutte*, 598 U.S. at 751 n. 4. Scienter cannot exist in a vacuum — there must be some sort of underlying bad act that was "knowingly" done (here, the false or fraudulent statement or claim). A broad swath of courts have correctly recognized that scienter under the FCA requires falsity, and this Court should hold the same. *Cf. United States v. Univ. of Phoenix,* 461 F.3d 1166, 1172 (9th Cir. 2006) (stating "some request for payment containing falsities made with scienter (i.e. with knowledge of the falsity[…] ) must exist"). Analyzing falsity first is consistent with the statute's framework, and is both logical and efficient. If a court recognizes that a particular claim cannot be false, then the court need not reach the question of scienter, which concerns the knowing submission of a *false* or *fraudulent* claim. *See* 31 U.S.C. § 3729(a)(1)(A), (B) (requiring that the knowing presentment or use giving rise to FCA liability be "false or fraudulent"). Conversely, if a claim can be

false, then the inquiry proceeds to whether the defendant had actual knowledge of the falsity or acted in deliberate ignorance or reckless disregard of the falsity.

This Court should reject the district court's approach of evaluating whether a requirement is ambiguous to determine if a defendant acted with scienter. The Supreme Court has consistently struck down judge-made requirements added to the FCA which are not embodied in the text or intent of the statute, and this Court should reject the judge-made comingling of the elements here. *See Univ. Health Servs. v. U.S. ex rel. Escobar*, 579 U.S. 186, 187 (2016) (rejecting complex caselaw concerning scope of implied certification theory across circuits and instead upholding validity of the theory by analyzing the text of the FCA).

## B. *Loper Bright* does not preclude Courts from considering agency guidance in determining the meaning of a statute or regulation.

Finally, the district court incorrectly narrowed the falsity inquiry by misconstruing the import of *Loper Bright*, which does not preclude courts from considering agency interpretation and guidance in interpreting statutory text. *See Loper Bright*, 144 S. Ct. at 2273 (stating "[c]areful attention to the judgment of the Executive Branch may help inform" a court's interpretation of a statute). The district court stated that it "interpreted the Rebate Statute for itself" and disclaimed any reliance on "CMS's interpretation of the Rebate Statute." *Forest Labs*, 2024 U.S. Dist. LEXIS 129331, at *88. Even after *Loper Bright*, however, "courts may seek aid from the interpretations of those responsible for implementing particular

statutes," which entails "giving weight to the agency's interpretation 'depend[ing] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Mayfield v. U.S. Dep't of Labor*, 117 F.4th 611, 619-20 (5th Cir. 2024) (citing *Loper Bright*, 144 S. Ct. at 2262; *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). In FCA actions, because the federal government is ultimately engaged in the contract or administering the program at issue, courts ought to place a great deal of weight on the underlying agency's interpretation for purposes of determining falsity. *See Skidmore*, 323 U.S. at 139, 140 (finding that where "the Administrator's policies are made in pursuance of official duty, based upon… specialized experience," they are entitled to "considerable weight" and "[constitute] a body of experience and informed judgment to which courts… may properly resort for guidance").

If courts were to completely reject agency guidance and expertise in parsing federal statutes, it would needlessly complicate the ability of federal agencies to oversee the funds appropriated to those agencies, particularly in the context of complex regulatory regimes such as Medicaid. *Forest Labs*, 2024 U.S. Dist. LEXIS 129331, at *50 (quoting prior caselaw and stating "Medicaid statutes and regulations are among the most completely impenetrable texts within human experience[…] it is probably an understatement to say that calculation of a manufacturer's average

and best prices… is a complex enterprise"). Courts regularly recognize the value of agency guidance and interpretation when parsing falsity under a complex regulatory regime. *See, e.g., U.S. ex rel. Lynch v. Univ. of Cincinnati Med. Ctr., LLC*, Case No. 1:18-cv-587, 2020 U.S. Dist. LEXIS 48214, at *51-53 (S.D. Oh. Mar. 20, 2020) (rejecting Defendant's Motion to Dismiss predicated on argument that noncompliance with a National Coverage Determination did not give rise to FCA claim because it "is not a binding law or regulation," instead holding the underlying Medicare statute "delegated" promulgation of the relevant regulations to HHS).

Ignoring agency guidance in interpreting regulatory schemes would be particularly harmful to federal healthcare programs, which rely on guidance from entities like CMS. An estimated $100 billion is lost to fraud on Medicare and Medicaid alone.[19] Across the entire federal government, the Government Accountability Office has estimated that between $233 billion to $521 billion is lost yearly as the result of fraud.[20] The Government Accountability Office has

---

[19] Scott Zamost and Contessa Brewer, "Inside the mind of criminals: How to brazenly steal $100 billion from Medicare and Medicaid," CNBC (Mar. 9, 2023), https://www.cnbc.com/2023/03/09/how-medicare-and-medicaid-fraud-became-a-100b-problem-for-the-us.html

[20] Report, Gov't Accountability Office, "Fraud Risk Management: 2018-2022 Data Show Federal Government Loses an Estimated $233 Billion to $521 Billion Annually to Fraud, Based on Various Risk Environments," https://www.gao.gov/products/gao-24-105833

underscored the necessity of additional action to save federal programs billions of dollars.[21] Although *Loper Bright* held that courts are not obligated to defer to agencies' interpretations of statutes, providing substantial weight to agency expertise and guidance when agencies are overseeing appropriated funds is not inconsistent with *Loper Bright* and conforms with the ultimate policy goals of the FCA to redress and deter fraud on government programs.

## <u>CONCLUSION</u>

This Court should reverse the District Court's judgment and remand this case.

Respectfully submitted,

*/s/ Samuel J. Buffone, Jr.*
Samuel J. Buffone, Jr.
Michael DeJesus
BUFFONE LAW GROUP PLLC
4301 Connecticut Ave NW, Ste 310
Tel: (202) 670-0403
Email: sam@buffonelawgroup.com
        michael@buffonelawgroup.com

Jacklyn DeMar
THE ANTI-FRAUD COALITION
1220 19th Street NW – Suite 501
Tel: (202) 296-4826
Fax: (202) 296-4838
Email: jdemar@taf.org

---

[21] Medicare and Medicaid: Additional Actions Needed to Enhance Program Integrity and Save Billions, Gov't Accountability Office, https://www.gao.gov/products/gao-24-107487

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of FED. R. APP. P. 29(a)(5) because the word-processing system used to prepare the brief, Microsoft Word, indicates that this brief contains 4,652 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Samuel J. Buffone, Jr.*
Samuel J. Buffone, Jr.
Michael DeJesus
BUFFONE LAW GROUP PLLC
4301 Connecticut Ave NW, Ste 310
Tel: (202) 670-0403
Email: sam@buffonelawgroup.com
michael@buffonelawgroup.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 10, 2024, I electronically filed the foregoing Brief of Appellees with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.

The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ Samuel J. Buffone, Jr.
Samuel J. Buffone, Jr.
Michael DeJesus
BUFFONE LAW GROUP PLLC
4301 Connecticut Ave NW, Ste 310
Tel: (202) 670-0403
Email: sam@buffonelawgroup.com
michael@buffonelawgroup.com